UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| VINOD PODICHETTY and ROBERT KELSEY, Individually and on Behalf of All Others Similarly Situated, | ) ) ) No. 1:11-cv-10381 ) ) CLASS ACTION ) Plaintiffs, ) COMPLAINT ) ) vs. ) ) ) CLINICAL DATA, INC., FOREST ) LABORATORIES, INC., MAGNOLIA ) ACQUISITION CORP., RANDAL J. KIRK, ) ANDREW J. FROMKIN, LARRY D. ) HORNER, ARTHUR B. MALMAN, ) BURTON E. SOBEL, SCOTT TARRIFF and ) RICHARD J. WALLACE, ) ) Defendants. ) ) |

Plaintiffs, by their attorneys, allege as follows:

## SUMMARY OF THE ACTION

1.      This is a stockholder class action brought on behalf of the holders of Clinical Data, Inc. ("Clinical Data" or the "Company") common stock against Clinical Data, Forest Laboratories, Inc. ("Forest") and its subsidiary Magnolia Acquisition Corp., and the Company's Board of Directors (the "Board") for breaches of fiduciary duty and/or other violations of state law arising out of defendants' efforts to complete the sale of Clinical Data to Forest pursuant to an unfair process and for an unfair price (the "Proposed Acquisition").  In pursuing the unlawful plan to sell Clinical Data to Forest, each of the defendants violated applicable law by directly breaching and/or aiding and abetting the other defendants' breaches of their fiduciary duties of loyalty, due care, candor, independence, good faith and fair dealing.

2.      Founded in 1969 and headquartered in Newton, Massachusetts, Clinical Data is a biotechnology company that engages in the development and commercialization of therapeutic products. Its principal products include the recently approved Viibryd, a selective serotonin reuptake inhibitor and serotonin 1A ($5HT_{1A}$) receptor partial agonist for the treatment of major depressive disorder ("MDD") in adults.  Clinical Data's other principal product is Stedivaze, a pharmacologic stress agent in Phase III development for use during myocardial perfusion imaging. Stedivaze is designed to expand the blood vessels of the heart to make it easier to get an image of those blood vessels, and is intended for use in patients with coronary artery disease who cannot undergo exercise stress testing.  The Company also has other drug candidates in development for various therapeutic areas, including asthma, ophthalmology, and diabetes.

3.      On February 22, 2011, Clinical Data announced that it had entered into a definitive merger agreement (the "Merger Agreement") with Forest pursuant to which Forest will acquire Clinical Data for $30.00 per share in cash plus contingent consideration of up to $6.00 per share that

may be paid upon achievement of certain commercial milestones related to Viibryd (the "Announcement").  According to the Announcement, "it is anticipated that Forest will promptly commence a cash tender offer to purchase all of the outstanding shares of Clinical Data" and, absent judicial intervention, the Proposed Acquisition is expected to be completed in the second quarter of 2011.

4.      The announcement of the Proposed Acquisition came as a shock to Clinical Data's shareholders and the investment community in general because, just weeks ago, Clinical Data had announced that it had achieved what is likely its most important milestone in its long corporate existence.   On January 21, 2011, Clinical Data announced that the U.S. Food and Drug Administration ("FDA") approved vilazodone HCl tablets, to be marketed under the brand name Viibryd.  Defendant Andrew J. Fromkin ("Fromkin"), Clinical Data's President and Chief Executive Officer ("CEO"), stated, "The recent FDA approval of Viibryd is a tremendous success for Clinical Data and we are eager to provide this first and only treatment that is a selective serotonin reuptake inhibitor and $5HT_{1A}$ receptor partial agonist to patients with MDD . . . .  ***Viibryd is a new and different antidepressant that will enter a $12 billion U.S. market, with potential for 11 years of market exclusivity***."  The Company's controlling stockholder and Board Chairman, Randal J. Kirk ("Kirk"), remarked that Viibryd is "***the first genuinely new antidepressant in 14 or 15 years***."

5.      Viibryd's dynamic earnings potential is, in part, reflected by the fact that it is uniquely placed among all other antidepressants in that $12 billion market – Viibryd has been clinically confirmed to have less adverse effects on the libido.  In fact, in a February 2, 2011 article published by ABC News entitled ***FDA Approves Antidepressant That Might Pack Fewer Sexual Side Effects***, Dr. Norman Sussman, professor of psychiatry at New York University's Langone Medical Center, was quoted as stating that "'[i]n the two clinical studies [of Viibryd] done so far,

- 2 -

there was no sign of sexual side effects.'"   Notably, clinicians actually observed a slight improvement in sexual function for patients treated with Viibryd.  "'It would be wonderful to offer a drug that works as well as the drugs we have but doesn't cause sexual dysfunction,'" Sussman was quoted as stating in the same article.  In Kirk's words: "I haven't spoken to anyone who doesn't appreciate the differentiation [Viibryd] has."

6.     Despite this groundbreaking news, defendants agreed to a plainly lowball and unfair price of $30.00 per share and a mere $6.00 per share in contingency payments.  On February 18, 2011, Clinical Data's shares closed at $33.90 per share.  The Company issued the Announcement before trading on February 22, 2011, and Clinical Data's shares went into an immediate tailspin, opening that day at $31.01 per share.  By the end of the week, on February 25, 2011, Clinical Data's stock closed at just $30.30 per share, *representing a 10.6% decline since the Proposed Acquisition was announced.*  Thus, by the simple act of announcing the Proposed Acquisition, the Board actually destroyed significant shareholder value in both the short and long term.

7.     The Proposed Acquisition's lowball price also seriously undercut Wall Street estimates for the value of Clinical Data's stock.  On February 15, 2011, Wedbush raised their price target for Clinical Data stock to $42.00 with an "outperform" rating.  Separately, analysts at Rodman & Renshaw initiated coverage of Clinical Data on January 24, 2011 with an "outperform" rating and a $46.00 price target on the stock.  On the same day, analysts from McNicoll Lewis & Vlak raised their price target for Clinical Data to $42.00 per share.

8.     While the Proposed Acquisition's lowball price is plainly harmful to Clinical Data's minority shareholders, it was purely designed to benefit controlling shareholder Kirk.  Indeed, the transaction fit an investment pattern that Kirk boasted about just days before the Announcement.  In a recent *Forbes* magazine profile of Kirk, he indicated that his strategy is to "buy obscure companies

at a very low price, stay the course until a drug gets to the market . . . and sell at a good price to drug companies that need product." That is exactly what Kirk did here, but without the good price. Kirk was seeking an exit to his large and illiquid holdings in Clinical Data stock in order to concentrate on his favored investment, a biotechnology company called Intrexon. He refers to Intrexon's technology as "'world-changing,'" states that it is "'by far the best thing I have ever seen,'" and calls it "'the Google of life sciences.'" But even though Clinical Data held a similar potential with the approval of Viibryd, Kirk sought an early exist for his investment and, in so doing, cashed out the minority shareholders at an unfair price.

9.      In recent filings with the U.S. Securities and Exchange Commission ("SEC"), Clinical Data stated that as of December 31, 2010, Kirk and his affiliated entities beneficially owned 52.5% of the Company's stock. Thus, the Company admitted that Kirk is "to control or significantly influence all matters requiring approval by our stockholders, including the election of directors and the approval of mergers or other significant corporate transactions" and then informed its minority shareholders that Kirk and his affiliates' interests might "differ from yours, and they might vote in a way with which you disagree and that could be adverse to your interests."

10.     The Company's warning regarding Kirk's conflict of interest materialized just weeks later in the lowball Proposed Acquisition, which Kirk and the other defendants designed as a *fait accompli* through a number of deal protection mechanisms that will effectively preclude any topping bid, including:

- a "Top Up Option," whereby if Forest acquires 78.8% of the Company's outstanding shares, defendants will cause the Company to grant Forest millions of authorized but unissued shares, which will allow Forest to surpass the 90% threshold necessary to complete a short form squeeze-out merger;

- a "Termination Fee" provision whereby Clinical Data must pay $45,000,000 to Forest in the event Clinical Data receives a higher offer for its shareholders, despite the no shop provision;

- a "No Shop" provision that requires Clinical Data to discontinue any discussions with all other potential acquirers and forbids the Company from entering into new discussions except in limited situations, thus precluding the Board from engaging in a fair process to sell the Company by seeking out the best possible price for Clinical Data shareholders as their fiduciary duties require; and

- Voting Agreements whereby Kirk and his affiliates will tender their securities into the tender offer and, if applicable, vote their outstanding shares in favor of the Proposed Acquisition.

11.     Acting on their own self-interest, defendants utilized a defective sales process which was not designed to maximize shareholder value or protect the interests of Clinical Data's shareholders, but rather was designed to divert the Company's valuable assets to Forest. Each of the defendants has breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or has aided and abetted such breaches. Rather than acting in the best interests of the Company's shareholders, defendants spent substantial effort tailoring the structural terms of the Proposed Acquisition to aggrandize their own personal interests and to meet the specific needs of defendants, which will eliminate the majority of the equity interest of the Company's shareholders.

12.     In essence, the Proposed Acquisition is the product of a flawed process that was designed to ensure the sale of Kirk's stock in Clinical Data to Forest, on terms preferential to defendants, but detrimental to plaintiffs and the Company's shareholders. Plaintiffs seek to enjoin the Proposed Acquisition.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a)(1) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. The Court also has jurisdiction over this action pursuant to 15 U.S.C. §78bb(f)(3)(A)(i), because it is a class action based on the statutory or common law of Delaware, defendant Clinical Data's state of incorporation, and thus

may be maintained in federal court. This Court has supplemental jurisdiction under 28 U.S.C. §1367.

14.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Clinical Data's headquarters are located at One Gateway Center, Suite 702, Newton, Massachusetts.

## PARTIES

16.     Plaintiff Vinod Podichetty, is, and at all relevant times was, a shareholder of Clinical Data. Plaintiff Podichetty is a citizen of the State of Florida.

17.     Plaintiff Robert Kelsey, is, and at all relevant times was, a shareholder of Clinical Data. Plaintiff Kelsey is a citizen of the State of Hawaii.

18.     Clinical Data is a biotechnology company headquartered in Newton, Massachusetts that trades on the NASDAQ under the ticker "CLDA." Clinical Data is sued as an aider and abettor herein.

19.     Defendant Forest is headquartered in New York and, according to the Announcement, claims that its longstanding global partnerships and track record developing and marketing pharmaceutical products in the United States have yielded its well-established central nervous system and cardiovascular franchises and innovations in anti-infective medicine. Forest is traded on the NYSE under the ticker "FRX." Forest is sued as an aider and abettor herein.

20.     Defendant Magnolia Acquisition Corp. ("Magnolia") is a Delaware corporation and is a wholly owned subsidiary of Forest. Magnolia is a citizen of the State of Delaware. Magnolia is sued as an aider and abettor herein.

21.     Kirk has been the Chairman of the Board of Clinical Data since December 2004 and has served as a director since 2002.  Kirk and his affiliates are controlling shareholders of Clinical Data and, thus, Kirk owes fiduciary duties in that capacity as well as by virtue of his seat on the Board.  Defendant Kirk is a citizen of the State of Virginia.

22.     Defendant Fromkin is a director of Clinical Data and has acted as the Company's CEO since May 2006.  Defendant Fromkin is a citizen of the State of New Jersey.

23.     Defendant Larry D. Horner is a director of Clinical Data.  Defendant Horner is a citizen of the State of New York.

24.     Defendant Arthur B. Malman is a director of Clinical Data.  Defendant Malman is a citizen of the State of New York.

25.     Defendant Burton E. Sobel is a director of Clinical Data.  Defendant Sobel is a citizen of the State of Vermont.

26.     Defendant Scott Tarriff is a director of Clinical Data.  Defendant Tarriff is a citizen of the State of New Jersey.

27.     Defendant Richard J. Wallace is a director of Clinical Data.  Defendant Wallace is a citizen of the State of North Carolina.

28.     The defendants named above in ¶¶21-27 are sometimes collectively referred to herein as the "Individual Defendants."

## CLASS ACTION ALLEGATIONS

29.     Plaintiffs bring this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all holders of the Company's stock who are being and will be harmed by defendants' actions described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

30.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

31.     The Class is so numerous that joinder of all members is impracticable.  According to its filings with the SEC, Clinical Data had 30 million shares issued and outstanding as of February 8, 2011.

32.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiffs and the other members of the Class in connection with the Proposed Acquisition;

(b)     whether defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(c)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best value reasonable under the circumstances for the benefit of plaintiffs and the other members of the Class in connection with the Proposed Acquisition;

(d)     whether defendants are unjustly enriching themselves and other insiders or affiliates of Clinical Data and/or Forest;

(e)     whether the Individual Defendants have breached any of their other fiduciary duties to plaintiffs and the other members of the Class in connection with the Proposed Acquisition, including the duties of good faith, diligence, candor and fair dealing;

(f)     whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets;

(g)     whether the Proposed Acquisition compensation payable to plaintiffs and the Class is unfair and inadequate; and

(h)     whether plaintiffs and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

33.     Plaintiffs' claims are typical of the claims of the other members of the Class and plaintiffs do not have any interests adverse to the Class.

34.     Plaintiffs are adequate representatives of the Class, have retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

35.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

36.     Plaintiffs anticipate that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

37.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

**THE PROPOSED ACQUISITION**

38.     Founded in 1969 and headquartered in Newton, Massachusetts, Clinical Data is a biotechnology company that engages in the development and commercialization of therapeutic products. Its principal products include the recently approved Viibryd, a selective serotonin reuptake inhibitor and serotonin 1A ($5HT_{1A}$) receptor partial agonist for the treatment of MDD in adults. Clinical Data's other principal product is Stedivaze, a pharmacologic stress agent in Phase III

- 9 -

development for use during myocardial perfusion imaging.  The Company also has other drug candidates in development for various therapeutic areas, including asthma, ophthalmology, and diabetes.

39.    On February 22, 2011, Clinical Data announced that it had entered into the Merger Agreement with Forest pursuant to which Forest will acquire Clinical Data for $30.00 per share in cash plus contingent consideration of up to $6.00 per share that may be paid upon achievement of certain commercial milestones related to Viibryd.  According to the Announcement, "it is anticipated that Forest will promptly commence a cash tender offer to purchase all of the outstanding shares of Clinical Data" and, absent judicial intervention, the Proposed Acquisition is expected to be completed in the second quarter of 2011.  The Announcement stated:

**Forest Laboratories to Acquire Clinical Data, Inc.**

**Forest Laboratories to Host Conference Call Today at 10:00 AM**

. . . Forest Laboratories, Inc. (Forest) and Clinical Data, Inc. (Clinical Data) today announced that they have entered into a definitive merger agreement pursuant to which Forest will acquire Clinical Data, a specialty pharmaceutical company focused on the development of first-in-class and best-in-category therapeutics, for $30.00 per share in cash plus contingent consideration of up to $6.00 per share that may be paid upon achievement of certain commercial milestones related to Viibryd™.  The upfront consideration of $30.00 per share represents a 6.6% premium to the volume-weighted average trading price of CLDA stock since the first trading day after the company announced the approval of Viibryd and that it was considering a potential change of control transaction and a 19.2% premium of the closing price on that day and totals $1.2 billion on a fully diluted basis, net of net cash acquired.  Forest will finance the transaction with existing cash.  The transaction was approved by the boards of both companies and is expected to be completed in the second quarter of 2011, subject to customary closing conditions.

The transaction will allow Forest to leverage its existing presence in the antidepressant category through the launch of Viibryd (vilazodone HCL tablets) which was developed by Clinical Data and approved by the FDA on January 21, 2011 for the treatment of adults with major depressive disorder (MDD). Viibryd is a selective serotonin reuptake inhibitor and a 5-HT1A receptor partial agonist. With Celexa® and Lexapro®, Forest has a proven track record of successfully commercializing novel anti-depressants. The market for the treatment of MDD is over 200 million prescriptions annually and increasing. Forest plans to launch

- 10 -

Viibryd in the U.S. during the second half of 2011. Viibryd is expected to retain market exclusivity until March 2020 including full patent term extension of its composition of matter patent and anticipated pediatric exclusivity. Other patents may further extend this period.

Howard Solomon, Chairman, Chief Executive Officer and President of Forest Laboratories said, "We are pleased to enter into this agreement with Clinical Data. Depression is a debilitating disease that affects the daily lives of millions of patients. We believe that we are uniquely positioned to bring Viibryd to market in light of our long and successful experience of clinical development and expertise in the antidepressant market. This transaction is consistent with our strategy to acquire new products that will help offset the loss of revenues due to patent expiries. Viibryd will be the second new product that we expect to launch this year in addition to Teflaro™. In addition, we are hopeful to obtain FDA approval later this quarter for Daxas (roflumilast), for the treatment of COPD. We plan to submit New Drug Applications for aclidinium and linaclotide in the second half of this year and for two additional products in calendar 2012."

The transaction is expected to be dilutive, net of synergies, to Forest's earnings per share for the next three fiscal years, with earnings per share dilution in the range of ($0.55) to ($0.65) in fiscal 2012. The transaction may become accretive during fiscal 2014. The transaction is not expected to impact

Forest's fiscal year 2011 financial guidance. The launch of Viibryd will require significant incremental marketing and sales investment, including a planned sales force expansion. Additional sales resources will be necessary in order to adequately support Viibryd, as well as our currently marketed products Teflaro, Savella®, Bystolic®, Namenda and Lexapro and the anticipated launch of Daxas (roflumilast), pending FDA approval in calendar 2011.

In addition, the transaction brings to Forest Stedivaze™ (apadenoson), a potent agonist of the adenosine A2A receptor subtype with improved selectivity for this receptor over other subtypes (A1 and A2B). Stedivaze is a coronary vasodilator in Phase III development as a pharmacologic stress agent for radionuclide myocardial perfusion imaging (MPI).

Under the terms of the definitive merger agreement, it is anticipated that Forest will promptly commence a cash tender offer to purchase all of the outstanding shares of Clinical Data common stock for $30.00 per share in cash and the non-transferable contractual right that could deliver up to an additional $6.00 per share in cash if U.S. net sales of Viibryd over four consecutive fiscal quarters commencing from the date of the closing of the transaction reach or exceed $800 million within the first 5 years ($1.00 per share), $1.1 billion within the first 6 years ($2.00 per share) and $1.5 billion within the first 7 years ($3.00 per share). The terms of the contingent payments reflect the parties' agreement over the sharing of potential economic upside benefits from future U.S. net sales of Viibryd and do not necessarily reflect anticipated sales of the product. There can be no assurance such

- 11 -

levels of net sales will occur or that any or all of the contingent payments will be made. In the tender offer Forest would also offer to purchase certain outstanding notes and warrants issued by Clinical Data that are convertible into or exercisable for shares of Clinical Data common stock. Under the terms of the definitive merger agreement, the transaction is conditioned upon, among other things, satisfaction of a minimum tender condition requiring that the securities tendered in the tender offer represent approximately 78.8% of the outstanding shares of Clinical Data common stock on a fully-diluted basis. In addition the transaction is subject to the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. In the event that the minimum tender condition is not met, and in certain other circumstances, the parties have agreed to complete the transaction through a one-step merger after receipt of stockholder approval. Randal J. Kirk, the Chairman of Clinical Data's board of directors, and certain of his affiliates, as well as other directors and officers of Clinical Data, which beneficially own approximately 52.3 percent of Clinical Data's outstanding shares on a fully diluted basis, have entered into agreements pursuant to which they will tender their outstanding securities into the tender offer and, if applicable, vote their outstanding shares of Clinical Data common stock in favor of the merger.

Morgan Stanley is acting as financial advisor to Forest and Covington & Burling LLP is acting as legal counsel. J.P. Morgan Securities LLC is acting as financial advisor to Clinical Data and Cooley LLP is acting as legal counsel.

40.     The announcement of the Proposed Acquisition came as a shock to Clinical Data's shareholders and the investment community in general because, just weeks ago, Clinical Data had announced that it had achieved what is likely its most important milestone in its long corporate existence.  On January 21, 2011, Clinical Data announced that the FDA approved vilazodone HCl tablets, to be marketed under the brand name Viibryd.  Defendant Fromkin stated, "The recent FDA approval of Viibryd is a tremendous success for Clinical Data and we are eager to provide this first and only treatment that is a selective serotonin reuptake inhibitor and $5HT_{1A}$ receptor partial agonist to patients with MDD . . . .  ***Viibryd is a new and different antidepressant that will enter a \$12 billion U.S. market, with potential for 11 years of market exclusivity***."  The Company's controlling stockholder and Board Chairman, defendant Kirk, remarked that Viibryd is "***the first genuinely new antidepressant in 14 or 15 years***."  Clinical Data described one of its earlier trials for Viibryd (then called "vilazodone") as follows:

**Clinical Data, Inc. Announces Publication of Results from First Phase III
Study of Vilazodone in Treatment of Major Depressive Disorder**

– Findings Demonstrate Potential Effectiveness and Lack of Sexual Side Effects

. . . Clinical Data, Inc. today announced the publication of the complete results from its first pivotal Phase III study of vilazodone as a potential treatment for major depressive disorder in the *Journal of Clinical Psychiatry (JCP)*.  Vilazodone, if approved, could represents a new class of drugs for the treatment of depression, due to its novel dual mechanism of action as both a selective serotonin reuptake inhibitor (SSRI) and a 5HT1A partial agonist.  The *JCP* publication details the findings from a randomized, double-blind, placebo-controlled study in patients with major depressive disorder. Importantly, the publication describes an adverse event profile for vilazodone with effects on sexual function comparable to placebo; many antidepressants, including SSRIs, have been associated with increased sexual dysfunction, a common symptom of depression.  The *JCP* paper appears online as an Ahead of Print Article from the March 2009 issue.

A separate editorial, published in the March issue of the journal *Personalized Medicine*, reports additional research completed as part of the Phase III study, describing genetic biomarkers predictive of individual response to vilazodone.2 Together, these publications demonstrate the potential of vilazodone in the treatment of depression and illustrate proprietary genetic biomarkers of response that may be used to identify patients likely to receive enhanced benefit from treatment with vilazodone. Currently, prescribing depression medications is a trial and error approach, taking weeks to months for patients to find the right treatment. A pharmacogenetic test, such as the one being developed alongside vilazodone, could greatly improve this process by predicting which patients are likely to have an enhanced response to vilazodone.

"There is a need for new treatments for patients suffering from depression that are both efficacious and have the potential to offer a side effect profile that does not have the negative impact on sexual function that is associated with many current therapies," said Karl Rickels, M.D. Chief, Mood & Anxiety Disorders Program, Steward and Emily Mudd Professor of Psychiatry, Department of Psychiatry, University of Pennsylvania, lead author on the *JCP* and *Personalized Medicine* papers and a principal investigator for the vilazodone Phase III studies. "As many as 30 to 40% of patients currently on depression treatment with an SSRI report sexual side effects, which often leads to discontinuation of therapy. What we saw in this Phase III trial of vilazodone was very encouraging. Compared to placebo, there was no effect on sexual function; in fact, we observed a slight improvement in sexual function for patients treated with vilazodone, although it did not reach statistical significance."

"The publication of positive results from our first Phase III study in this prominent, peer-reviewed journal highlights the potential of vilazodone as a first-in-class antidepressant that is well tolerated and with positive differentiation on side

- 13 -

effects," said Carol R. Reed, M.D., Chief Medical Officer of Clinical Data, "Our second Phase III trial of vilazodone is nearly complete; we anticipate reporting results from this second study by the end of June, as well as submitting a New Drug Application (NDA) for vilazodone by the end of this year."

Both publications report findings from the Phase III study, in which the primary and supportive secondary efficacy endpoints were met. The randomized, double-blind, placebo-controlled, ten-site trial enrolled 410 adult patients with major depressive disorder. In this study, patients taking vilazodone achieved a significantly (p=0.001) greater improvement in mean Montgomery-Asberg Depression Rating Scale (MADRS) scores over an eight week period compared to those taking placebo. Statistically significant improvement in MADRS was observed starting at week one and on each subsequent visit, suggesting a rapid onset of action. In addition, a statistically significant improvement in symptoms of anxiety was observed.

The JCP publication also described adverse events associated with vilazodone. In general, vilazodone was well tolerated. During the eight weeks of treatment, the overall discontinuation rate was approximately 25% in both the vilazodone and the placebo arms of the study. In addition, vilazodone had no significant effect on sexual function with sexual dysfunction rates comparable to that of placebo, as measured using the Arizona Sexual Experience Scale (ASEX), a five-item scale commonly used to evaluate sexual dysfunction in clinical trials. Changes in ASEX scores suggested a slight improvement in sexual function over the course of the study, although it did not reach statistical significance. The most common adverse events in patients treated with vilazodone were diarrhea, nausea and somnolence, with diarrhea occurring most frequently during dose titration, with a median duration of five days in the vilazodone group and four days in the placebo group. Only four patients treated with vilazodone discontinued due to diarrhea.

As part of the Phase III study, genetic biomarkers of response to vilazodone were identified and further details regarding these biomarkers were reported in the *Personalized Medicine* publication. An example of a proprietary biomarker correlated with efficacy is described, which shows that individuals with the genetic marker, representing about 30% of patients, experienced twice the response to vilazodone. Other genetic biomarkers were predictive of specific adverse events including gastrointestinal side effects.

**About Vilazodone**

Vilazodone is a dual serotonergic Phase III antidepressant that Clinical Data is developing in parallel with genetic biomarkers to guide the use of this novel antidepressant. It is both a Selective Serotonin Reuptake Inhibitor (SSRI) and a 5HT1A partial agonist. As approximately one-half of depressed patients do not achieve satisfactory results with current first-line treatment options, Clinical Data also seeks to develop a potential companion diagnostic for vilazodone which may assist physicians in matching patients with a treatment that is more likely to be effective.

**About Depression and the Antidepressant Market**

According to the National Institute of Mental Health (NIMH), 18.1 million Americans suffered from depression in 2007. In addition, major depressive disorder is the leading cause of disability in the US for individuals ages 15 - 44. IMS Health's National Sales Perspective reported that antidepressants generated sales of more than $12 billion in 2008. The Surgeon General's Office also estimates that 5.3% of American adults, approximately 17 million people, suffer from depressive illness. It is believed that some people may be genetically predisposed to depression and that it may be possible to identify certain genetic biomarkers that might help to predict the likelihood of a patient's pharmacological response to a given antidepressant.

41.     Viibryd's dynamic earnings potential is, in part, reflected by the fact that it is uniquely placed among all other antidepressants in that $12 billion market – Viibryd has been clinically confirmed to have less adverse effects on the libido.  In fact, in a February 2, 2011 article published by ABC News entitled *FDA Approves Antidepressant That Might Pack Fewer Sexual Side Effects*, Dr. Norman Sussman, professor of psychiatry at New York University's Langone Medical Center, was quoted as stating that "'[i]n the two clinical studies [of Viibryd] done so far, there was no sign of sexual side effects.'"   Notably, clinicians actually observed a slight improvement in sexual function for patients treated with Viibryd.  "'It would be wonderful to offer a drug that works as well as the drugs we have but doesn't cause sexual dysfunction,'" Sussman was quoted as stating in the same article.  In Kirk's words: "I haven't spoken to anyone who doesn't appreciate the differentiation [Viibryd] has."   Clinical Data explained some of these results as follows:

**Clinical Data, Inc. Reports Third Quarter Fiscal Year 2011 Operational and Financial Results**

– Recent FDA Approval of Viibryd™ (vilazodone HCl) for Major Depressive Disorder a Key Milestone Achieved –

– Phase III Trial of Stedivaze is Ongoing with Second Phase III Study to Begin in 2Q Calendar 2011 –

. . . Clinical Data, Inc. today announced operational and financial results for the third fiscal quarter ended December 31, 2010. The Company received approval

from the U.S. Food and Drug Administration (FDA) of Viibryd™ for the treatment of adults with major depressive disorder (MDD) on January 21, 2011. In addition, Phase III development of Stedivaze, the Company's coronary vasodilator for use in nuclear-SPECT myocardial perfusion imaging (MPI), is continuing with the initiation of a second Phase III trial anticipated in the second quarter of this calendar year.

"The recent FDA approval of Viibryd is a tremendous success for Clinical Data and we are eager to provide this first and only treatment that is a selective serotonin reuptake inhibitor and 5HT1A receptor partial agonist to patients with MDD," said Drew Fromkin, Clinical Data's President and Chief Executive Officer. "Viibryd is a new and different antidepressant that will enter a $12 billion U.S. market, with potential for 11 years of market exclusivity."

## Third Quarter Fiscal 2011 and Recent Highlights

- Obtained FDA approval of Viibryd™ for the treatment of adults with MDD, with the product expected to be available in U.S. pharmacies in the second quarter of this calendar year

- Obtained an issued patent for the most commercially viable polymorphic form of Viibryd (vilazodone HCl, Form IV), providing Viibryd exclusive protection in the U.S. for nearly three additional years. This issued patent will expire in 2022.

- Presented supportive data from clinical trials of Viibryd at major medical meetings, including: 1) two placebo-controlled Phase III clinical trials and a long-term safety study demonstrating Viibryd's therapeutic profile, 2) a Thorough QT Study, and 3) a bioavailability study

- Sold the Company's genetic and pharmacogenomic testing and biomarker development business for $15.6 million plus certain future accounts receivables, milestones and royalties, completing Clinical Data's transformation into a pharmaceutical company with a deep product pipeline

- Received notice of a $2.0 million milestone from Santen Pharmaceutical Co., Ltd. for their filing of an Investigational New Drug (IND) application with the FDA for Clinical Data's highly selective adenosine A2A agonist, ATL313, for primary open angle glaucoma and ocular hypertension. Santen expects to begin clinical trials in early 2011.

- Obtained Orphan Drug Designation from the FDA for PRX-8066, a selective serotonin 2B (5-HT2B) receptor antagonist, in Phase II development for pulmonary arterial hypertension (PAH)

- Received two grants totaling nearly $0.5 million for research and development efforts related to Viibryd and Stedivaze

- Reported a cash burn for the quarter of $4.7 million, which included $6.0 million related to a portion of the cash proceeds from the sale of the Company's genetic testing business, $1.5 million from the release of funds held in escrow from a previous transaction, and other items totaling approximately $1.0 million

Commenting on the Company's third quarter financial results, Mr. Fromkin added, "Our track record of fiscal discipline is evident again this quarter. By employing a strict cash management and resource prioritization approach, together with our proven ability to monetize non-core assets again this quarter, we reported a cash burn of under $5.0 million. This is a notable achievement when considering the increased expenses related to the commercial launch preparations for Viibryd and continued patient enrollment in our Phase III trial for Stedivaze."

**Financial Results for the Three Months Ended December 31, 2010**

Revenue for the three months ended December 31, 2010 was $2.0 million, all of which was related to a non-recurring milestone from Santen upon filing its IND for Clinical Data's ATL313 compound in development for glaucoma. The Company did not have any revenue during the three months ended December 31, 2009, after the financial statements were adjusted to reflect the genetic and biomarker development business as discontinued operations.

Research and development expenses were essentially flat at $8.9 million for the three months ended December 31, 2010, compared with $8.8 million for the three months ended December 31, 2009. Research and development efforts were primarily attributable to the commercialization activities for Viibryd in anticipation of FDA approval, which occurred in early 2011, and the ongoing Phase III ASPECT 1 trial for Stedivaze.

General and administrative expenses increased $0.6 million, or 20%, to $3.8 million for the three months ended December 31, 2010 from $3.2 million for the three months ended December 31, 2009.

**Financial Results for the Nine Months Ended December 31, 2010**

Revenue for the nine months ended December 31, 2010 was $4.0 million, attributed to two non-recurring $2.0 million milestones from Santen: 1) exercising their option to license ATL313 for further development of glaucoma treatments in May 2010, and 2) filing an IND with ATL313 for glaucoma in December 2010. The Company did not have any revenue during the nine months ended December 31, 2009, after the financial statements were adjusted to reflect the genetic and biomarker development business as discontinued operations.

Research and development expenses remained essentially flat at $27.4 million for the nine months ended December 31, 2010, compared to $27.2 million for the nine months ended December 31, 2009.

General and administrative expenses increased $1.3 million, or 11%, to $12.5 million for the nine months ended December 31, 2010, up from $11.2 million for the nine months ended December 31, 2009.

Cash and cash equivalents at December 31, 2010 were $42.3 million.

42.     Despite this groundbreaking news, defendants agreed to a plainly lowball and unfair price of $30.00 per share and a mere $6.00 per share in contingency payments.  On February 18, 2011, Clinical Data's shares closed at $33.90 per share.  The Company issued the Announcement before trading on February 22, 2011, and Clinical Data's shares went into an immediate tailspin, opening that day at $31.01 per share.  By the end of the week, on February 25, 2011, Clinical Data's stock closed at just $30.30 per share, ***representing a 10.6% decline since the Proposed Acquisition was announced.***  Thus, by the simple act of announcing the Proposed Acquisition, the Board actually destroyed significant shareholder value in both the short and long term.

43.     The Proposed Acquisition's lowball price also seriously undercut Wall Street estimates for the value of Clinical Data's stock.  On February 15, 2011, Wedbush raised their price target for Clinical Data stock to $42.00 with an "outperform" rating.  Separately, analysts at Rodman & Renshaw initiated coverage of Clinical Data on January 24, 2011 with an "outperform" rating and a $46.00 price target on the stock.  On the same day, analysts from McNicoll Lewis & Vlak raised their price target for Clinical Data to $42.00 per share.

44.     While the Proposed Acquisition's lowball price is plainly harmful to Clinical Data's minority shareholders, it was purely designed to benefit the Company's controlling shareholder, Kirk.  Indeed, the transaction fit an investment pattern that Kirk boasted about just days before the Announcement.  In a recent *Forbes* magazine profile of Kirk, he indicated that his strategy is to "buy obscure companies at a very low price, stay the course until a drug gets to the market . . . and sell at a

- 18 -

good price to drug companies that need product." That is exactly what Kirk did here, but without the good price. Kirk was seeking an exit to his large and illiquid holdings in Clinical Data stock in order to concentrate on his favored investment, a biotechnology company called Intrexon. He refers to Intrexon's technology as "'world changing,'" states that it is "'by far the best thing I have ever seen,'" and calls it "'the Google of life sciences.'" But even though Clinical Data held a similar potential with the approval of Viibryd, Kirk sought an early exist for his investment and, in so doing, cashed out the minority shareholders at an unfair price.

45. In recent filings with the SEC, Clinical Data stated that as of December 31, 2010, Kirk and his affiliated entities beneficially owned 52.5% of the Company's stock. Thus, the Company admitted that Kirk is "to control or significantly influence all matters requiring approval by our stockholders, including the election of directors and the approval of mergers or other significant corporate transactions" and then informed its minority shareholders that Kirk and his affiliates' interests might "differ from yours and they might vote in a way with which you disagree and that could be adverse to your interests."

46. The Company's warning regarding Kirk's conflict of interest materialized just weeks later in the lowball Proposed Acquisition, which Kirk and the other defendants designed as a *fait accompli* through a number of deal protection mechanisms that will effectively preclude any topping bid, including:

- a "Top Up Option," whereby if Forest acquires 78% of the Company's outstanding shares, defendants will cause the Company to grant Forest millions of authorized but unissued shares, which will allow Forest to surpass the 90% threshold necessary to complete a short form squeeze-out merger;

- a "Termination Fee" provision whereby Clinical Data must pay $45,000,000 to Forest in the event Clinical Data receives a higher offer for its shareholders, despite the no shop provision;

- a "No Shop" provision that requires Clinical Data to discontinue any discussions with all other potential acquirers and forbids the Company from entering into new

discussions except in limited situations, thus precluding the Board from engaging in a fair process to sell the Company by seeking out the best possible price for Clinical Data shareholders as their fiduciary duties require; and

- Voting Agreements whereby Kirk and his affiliates will tender their securities into the tender offer and, if applicable, vote their outstanding shares in favor of the Proposed Acquisition.

47.     Acting on their own self-interest, defendants utilized a defective sales process which was not designed to maximize shareholder value or protect the interests of Clinical Data's shareholders, but rather was designed to divert the Company's valuable assets to Forest.  Each of the defendants has breached their fiduciary duties of loyalty, due care, independence, candor, good faith and fair dealing, and/or has aided and abetted such breaches.  Rather than acting in the best interests of the Company's shareholders, defendants spent substantial effort tailoring the structural terms of the Proposed Acquisition to aggrandize their own personal interests and to meet the specific needs of defendants, which will eliminate the majority of the equity interest of the Company's shareholders.

48.     In essence, the Proposed Acquisition is the product of a flawed process that was designed to ensure the sale of Kirk's stock in Clinical Data to Forest, on terms preferential to defendants, but detrimental to plaintiffs and the Company's shareholders.  Plaintiffs seek to enjoin the Proposed Acquisition.

## DEFENDANTS' FIDUCIARY DUTIES AND
## THE ENTIRE FAIRNESS STANDARD

49.     In any situation where the directors of a publicly traded corporation undertake a transaction that will result in either (i) a change in corporate control or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors may not take any action that: (a) adversely affects

the value provided to the corporation's shareholders; (b) will discourage or inhibit alternative offers to purchase control of the corporation or its assets; (c) contractually prohibits them from complying with their fiduciary duties; (d) will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or (e) will provide the directors with preferential treatment at the expense of, or separate from, the public shareholders.

50.     In accordance with their duties of loyalty and good faith, the defendants, as directors and/or officers of Clinical Data, are obligated to refrain from: (a) participating in any transaction where the directors' or officers' loyalties are divided; (b) participating in any transaction where the directors or officers receive or are entitled to receive a personal financial benefit not equally shared by the public shareholders of the corporation; and/or (c) unjustly enriching themselves at the expense or to the detriment of the public shareholders.

51.     Specifically, in any situation where a controlling shareholder competes with minority shareholders for consideration, the entire fairness standard is implicated, and the defendants, at least initially, bear the burden of demonstrating the two basic aspects of fair dealing and fair price.

52.     The concept of fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The concept of fair price relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.

53.     The test for fairness is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness.

54.     To demonstrate entire fairness, the defendants must present evidence of the cumulative manner by which they discharged all of their fiduciary duties.  An entire fairness analysis then requires the Court to consider carefully how the board of directors discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price.  Because Kirk is a controlling shareholder and is competing with the minority stockholders for consideration, the burden to prove the entire fairness of the Proposed Acquisition will remain with defendants.

**CONSPIRACY, AIDING AND ABETTING,
AND CONCERTED ACTION**

55.     In committing the wrongful acts alleged herein, defendants have pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

56.     Each of the defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to, and furtherance of, the wrongdoing.  The defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

**COUNT I**

**Claim for Breach of Fiduciary Duties
Against the Individual Defendants**

57.     Plaintiffs repeat and reallege each allegation set forth herein.

58.     The Individual Defendants have violated their fiduciary duties of care, loyalty, candor, good faith and independence owed to the public shareholders of Clinical Data and have acted to put their personal interests ahead of the interests of Clinical Data shareholders.

59.     By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive plaintiffs and other members of the Class of the true value of their investment in Clinical Data.

60.     The Individual Defendants have violated their fiduciary duties by entering into the Proposed Acquisition without regard to the fairness of the transaction to Clinical Data's shareholders.

61.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Clinical Data because, among other reasons, they failed to ensure a fair process and maximization of shareholder value.

62.     Because the Individual Defendants dominate and control the business and corporate affairs of Clinical Data, and are in possession of private corporate information concerning Clinical Data's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Clinical Data which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits to the exclusion of maximizing stockholder value.

63.     By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward plaintiffs and the other members of the Class.

- 23 -

64.     As a result of the actions of defendants, plaintiffs and the Class have been and will be irreparably harmed.

65.     Unless the Proposed Acquisition is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to plaintiffs and the members of the Class, will not engage in arm's-length negotiations on the Proposed Acquisition's terms, and will not supply to Clinical Data's shareholders sufficient information to enable them to make informed decisions regarding the tender of their shares in connection with the Proposed Acquisition, and may consummate the Proposed Acquisition, all to the irreparable harm of the members of the Class.

66.     Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiffs and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty Against Defendants Clinical Data, Forest and Magnolia

67.     Plaintiffs repeat and reallege each allegation set forth herein.

68.     Defendants  Clinical Data, Forest and Magnolia are sued herein as aiders and abettors of the breaches of fiduciary duties outlined above by the Individual Defendants as members of the Board of Clinical Data.

69.     Such breaches of fiduciary duties could not and would not have occurred but for the conduct of defendants Clinical Data, Forest and Magnolia, which, therefore, aided and abetted such breaches via entering into the Merger Agreement.

70.     Defendants Clinical Data, Forest and Magnolia had knowledge that they were aiding and abetting the Individual Defendants' breaches of their fiduciary duties to Clinical Data shareholders.

71.     Defendants Clinical Data, Forest and Magnolia rendered substantial assistance to the Individual Defendants in their breaches of fiduciary duties to Clinical Data shareholders.

72.     As a result of Clinical Data, Forest and Magnolia's conduct of aiding and abetting the Individual Defendants' breaches of fiduciary duties, plaintiffs and the other members of the Class have been and will be injured in that they have been and will be prevented from obtaining a fair price for their shares.

73.     As a result of the unlawful actions of defendants Clinical Data, Forest and Magnolia, plaintiffs and the other members of the Class will be irreparably harmed in that they will be prevented from obtaining the real value of their equity ownership in the Company.  Unless the actions of defendants Clinical Data, Forest and Magnolia are enjoined by the Court, they will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to plaintiffs and the members of the Class, and will aid and abet a process that inhibits the maximization of shareholder value and the disclosure of material information.

74.     Plaintiffs and the other members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can plaintiffs and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs demand injunctive relief, in plaintiffs' favor and in favor of the Class and against defendants, as follows:

A.      Declaring that this action is properly maintainable as a class action;

B.      Declaring and decreeing that the Merger Agreement was entered into in breach of the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

C.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company adopts and implements a procedure or process to obtain the highest possible value for shareholders;

D.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of Clinical Data shareholders and to refrain from entering into any transaction until the process for the sale or merger of the Company is completed and the highest possible value is obtained;

E.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

F.     Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

DATED:  March 4, 2011                    By their attorneys,


/s/ Adam M. Stewart
Thomas G. Shapiro (BBO#454680)
Adam M. Stewart (BBO#661090)
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02109
Telephone:  (617) 439-3939
Facsimile:  (617) 439-0134
tshapiro@shulaw.com
astewart@shulaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RANDALL J. BARON
A. RICK ATWOOD, JR.
DAVID T. WISSBROECKER
DAVID A. KNOTTS
EUN JIN LEE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE
8117 Preston Road, Suite 300
Dallas, TX  75225
Telephone:  214/706-9314
214/706-9315 (fax)

POWERS TAYLOR LLP
PATRICK W. POWERS
Campbell Centre II
8150 North Central Expressway, Suite 1575
Dallas, TX  75206
Telephone:  214/239-8900
214/239-8901 (fax)

***Attorneys for Plaintiffs***